Lettie DiGiulio v. Amy Hebert, Appeal Order, first, the ineffective assistance of trial counsel for failure to object to gender discrimination during jury selection, and then second, the insufficiency of the state's evidence to overcome Ms. Hebert's insanity defense. I intend to devote the bulk of my time here today to the first issue, but hope to reach the second issue, and of course, I'm happy to answer questions about either issue. This case comes before the court under 28 U.S.C. 2254. Ms. Hebert first raised her sufficiency of the evidence claim on direct appeal, and then she first raised her ineffective assistance of counsel claim on state post-conviction. The state courts denied both of those claims, of course, which is why we're here today, but the state court rulings were involved in an unreasonable application of clearly established law, an unreasonable determination of the facts, or both. For that reason, there is no bar to this court's grant of relief. Turning to the first issue presented on appeal, the prosecution's discriminatory use of peremptory strikes against females during jury selection and trial counsel's failure to recognize it, I'd like to start by emphasizing that on both accounts, whether the counsel was ineffective in failing to recognize it, this is not a close case. During jury selection, the prosecution used 100% of its peremptory strikes against women, 12 out of 12 peremptory strikes against women, and that's just the start. There were so many more indicia of discrimination, including the state's use of backstrikes against four people, four women that had originally not only not struck for cause, but also not struck in initial peremptory strikes. And then also the— Wait until the end, right? I'm sorry? Wait until the end to make those strikes. You don't have to exercise them immediately. That's correct. Backstrikes are allowed in Louisiana, correct. But it has been recognized both by the Louisiana Supreme Court and by the federal district court in Louisiana as being an indicia of discrimination because it allows the person exercising the challenge to disguise their motives for striking. And when you're not in the moment striking someone, the other party will forget why that person might have been stricken. In addition, the prosecutor hadn't indicated any concerns about the answers of the females that he struck. And then there was also an admission later towards the end of jury selection where the prosecutor said that he was going to use peremptory strikes until—he was just going to keep using peremptory strikes each time the jury was fully composed. And then finally, of course, the comparative juror analysis, just on the record, being able to—looking at the females who were struck and there not being any apparent reason to strike them, and in fact some of them being quite pro-prosecution compared to males who were accepted and actually served on the jury. Ultimately, there was an unmistakable pattern in the prosecution's use of its strikes that should have raised huge red flags for trial counsel, should have sounded—he should have raised huge red flags for prosecution's use of his strikes. If he had known—or any objectively reasonable attorney who knew the law, who knew J.E.B. v. Alabama, which prohibits the discrimination against women in jury selection, then he would have done something, but he didn't. There was clearly a prima facie case of discrimination here, and the U.S. Supreme Court has recognized such with far less evidence. Strickland v. Washington, of course, affords a great deal of discretion to the strategy decisions of trial counsel, but this was not a strategic judgment call. This was just an omission. No reasonable jurist could conclude that counsel performed strategically in failing to object to jury discrimination, to the use of the prosecution's strikes. During jury selection, defense counsel knew that the prosecutor had used 12 strikes against women. Four of those strikes were backstrikes. The prosecutor had asked no questions about the issues of concern, had not exercised any cause challenges against those women, and also— What was the final jury composition? The final jury was composed of 11 females and 2 males with alternates, 3 male alternates and 1 female alternate. There were 4 alternates. In total, that would be 11 females, 5 males when you include the alternates, but 10 and 2 for the regular jury. The other thing that trial counsel knew and what really highlights why this could not have been a strategic decision is that the jurors who were struck were either favorable to their prosecution, meaning that the defense should have wondered why they were being struck because they were favorable to the state and inexplicably being cut. Four of the men were stricken for cause or hardship. You're not considering those. I'm sorry? Four of the potential jurors who were men were stricken for cause or for hardship, which would mean that the court would strike them. Well, there were a lot more than four men stricken for cause. Originally, I think we started out with about 198 people. Then it came down to 23 women and 10 men. Out of the 10 men, 4 were stricken for cause or hardship. According to the numbers that I have, it was 39 females to 16 males. The final panels after they had been whittled down and then randomly allotted were 55 people. I believe the district court had made reference to that number, but that's not the number that I've reached. There were a lot of men and a lot of women stricken for cause, no doubt. The other thing that the defense counsel knew that made it clear that it was not a strategic decision not to raise an objection is that there were jurors who were struck that the jury. There was no reasonable strategic reason to explain the failure to raise an objection, at least to some of those people, to some of those jurors who were desirable. Even if you would have picked a different jury in terms of which females to keep, which Do the numbers themselves allow you to . . . Well, they do because you say it. To say that there was no strategic reason is saying a lot, given the case law, etc., in other dimensions. Whereas here, with such a large pool to start with, a large pool of women, etc., etc., so putting aside whether this female versus that one would have been a better or more favorable one, do the numbers . . . What case can you point to that just looking at the numbers themselves allow us to get past the jurisprudence in terms of what is and what isn't a strategic decision by the lawyers below? There were two lawyers below, weren't there? Or was there one? Well, first of all, I'd point out that Snyder versus Louisiana, a U.S. Supreme Court case that arose in Louisiana, held that or recognized that the discriminatory use of a peremptory against only one person, one single person, is too many. So that regardless of . . . No one quarrels with the lawyers. That's not the issue. I mean, one of the quarrels with the law is you're starting off with an ineffective assistance of counsel premise is where you start, which inherently intones that the lawyer or lawyers below did not make a judgment that sort of squares with what's in front. I was simply asking, given that hurdle . . . I mean, there are some cases where maybe it's more extreme or whatever. Maybe it's more easily discernible. I'm just saying, on the ground in the situation here, with the veneer of what it is, et cetera, do the numbers themselves, or stated another way, what case best allows us to say that it's totally without the rim of any strategic decision by defense counsel relative to this pool? I know you make that argument, but saying it to me doesn't necessarily make it so. Well, maybe what I'm missing is how the pool is related to the strategic decision. The defense counsel presumably was not trying to reach any particular gender composition of the jury. In fact, he's precluded by U.S. Supreme Court precedent and equal protection from doing so. So the numbers were what they were. The numbers, by happenstance, by cause, challenges, were what they were. But what wasn't happenstance was the intentional discrimination by the state. When the defense saw that, and not only saw that there was a clear case of it that could have been objected to, but that he had a reason to want some of those females, some of those particular females, to be on the jury because they had characteristics about them that were favorable, all he needed to do was object because it would have been granted not only because the prima facie case was there, but also because once the state in post-conviction gave its gender-neutral reasons, those gender-neutral reasons didn't hold up. So that had the defense objected, then they could have – there were a lot of different remedies that could have been given, but they could have had jurors that they liked reseated. That is certainly a smart strategic decision is to get jurors that they like reseated. They could have gotten the peremptories that were abused by the prosecution taken away under Louisiana law. They could have caused them to have to lose them. They could have gotten the entire panel, the entire veneer. There are all sorts of different remedies. But all of them could have been – all of those would have been strategic. But doing nothing wasn't because doing nothing meant that they lost jurors that were more favorable and that there was a structural error embedded in the proceedings because gender discrimination is a structural error. While you have still time on this end of the clock, why don't you shift to your second? Certainly. Thank you. The second issue I'd like to address is the issue of the sufficiency of the evidence. Even if this court grants Ms. Hebert a new trial on the basis of the discrimination against women in jury selection, this court still must assess whether or not there is sufficient evidence to retry Ms. Hebert for first-degree murder. I submit that there's not. This court in the habeas case of Perez v. Cain articulated the Jackson standard in the context – the Jackson v. Virginia standard in the context of an insanity defense as whether viewing the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt that the defendant failed to prove by a preponderance of the evidence that she was insane at the time of the crime. The state court's decision that a First Circuit appellate court affirming Ms. Hebert's conviction involved an unreasonable application of that standard and an unreasonable determination of the facts. At the trial in this case, the defense presented the testimony of three mental health experts who assessed Ms. Hebert's sanity at the time that she killed her two children, her dog, and tried to kill herself. These three experts considered a wide range of evidence, including the extensive clinical interviews with Ms. Hebert, her personal and family history of mental illness, the circumstances of the offense and the crime scene, interviews with family and friends, and the contemporaneous report of psychiatrist Dr. Alexandra Phillip. And if I could, I'd like to go into some of those details because they're important in carrying her burden of preponderance of the evidence. You'd really be stellar to do it in 15 seconds. Time flies. Well, I'll let you get into it so that when you come back on rebuttal, it wouldn't be that you didn't talk about it at all. I appreciate it. But you've preserved your rebuttal time. Okay, thank you. You may want to come back to that point. I appreciate it. All right. It seemed much longer when other people were doing it. Yeah, when you're there, it kind of runs. All right, counsel. How do you pronounce it? Sogne? Sogne. Sogne. Okay. Good afternoon, Your Honors. May it please the Court.  I'm representing James Rogers and State of Louisiana and our interest in this appeal. And I really don't have a whole lot I want to get into, but what I want to start by doing is to try to build upon something that the district court below focused on as an important part of their ruling on the first claim, which is the alleged discrimination in jury selection, and to follow up with some questions Judge Stewart just had for appellant's counsel. If you go back, the magistrate report and recommendation below found a specific strategic reason why defense counsel in the case below, in the trial court, would not have wanted to object to an alleged Batson-JEB type of discrimination. And they went through that in great detail. And most of it comes from not just the arguments that the appellant made in her pevious petition, but going through the transcripts of Laudier. And they indicated there's a reason they didn't want to bring these jurors that we struck back in, because it would have been worse on the issue of the death penalty to the defense. Now, there's also argument that somehow the defense kind of missed the JEB objection. And in this case, we had three defense attorneys, excellent defense attorneys, two of which were obviously certified in capital litigation in the state of Louisiana, one of whom, Marty Stroud, was a former death penalty prosecutor. I would think he would have noticed prosecutorial discrimination had he seen it. The third attorney was George Pornam, who was granted Prohoc Vitae status. He had tried the Andrea Yates case in Houston, Texas, successfully involving a jury in kind of similar circumstances. They also had the benefit of a professional jury consulting firm. And the reason I'm bringing this up is this wasn't a case where you have overwhelmed or inexperienced counsel who kind of just missed an issue. The defense got the exact jury they wanted. And how do we know this? They didn't use all of their peremptory challenges. They left three on the table. And you have to conclude from that that once they got to that point where 12 jurors were seated, they had what they wanted. And the reason I'm going in this direction is what the defense wants us to do now is not really look at this as a Strickland issue where we have to talk about deficient performance. What they've alleged is there should be like a per se type of prejudice. In other words, a structural error analysis instead of the Strickland analysis. And here's the problem with that. If we go back to when we had the 12 jurors, we're satisfied with the composition, the defense is satisfied with the composition. Could the trial judge have said, you know what, Mr. Defense Counsel, I know you like the jury you have, but I see structural error. And structural error being an error that pervades a trial from its beginning to its end, as the Supreme Court has said, I'm going to exercise my role as a judge and I'm going to start tinkering with the jury you've just spent two weeks picking. And I'm going to make sure there's no error. Could a trial judge do that? And I would submit that's improper. I would submit if he tried to do that, the defense would object and say, we're happy. We don't need to have a structural error analysis here because this is our trial strategy. So the court below all of the state courts that reviewed these claims and the district court below properly analyzed this and concluded that there was a strategic reason to not exercise that objection. Therefore, we did not have deficient performance. Therefore, it was not necessary to even get to the prejudice claim. Now, having argued that, we are not stipulating that there was any discriminatory intent in jury selection in this matter. Counsel mentioned her math being different from the district court's math. I think what she's quoting is the full four-panel survivors, I should say, that we were left with after we'd gone through the death penalty and pre-trial publicity phase of Baudire. When we came back, it was a 39 according to her math, 39 to 16. The math that matters is what were the numbers as they were drawn sequentially? And we pointed this out in our responses both at the state court level and in the district court below. Disproportionately, the draw was female-heavy. As the court below noted, up to the relevant time where jury selection ended, 23 females and 10 males were drawn. So we're already in an area where you would expect, just by luck of the draw, more objections to be female than male. After the first wave of Baudire, the court struck four, so we're down to six. The defense struck four more, so we're down to two. And those are the two who survived. And as the district court below said, just based on that straightforward application, it's neither surprising that we used 11 peremptories against females, nor indicative of a discriminatory pattern. And again, I will point out, as we've done throughout when the allegation is made, counsel just stood up and said 12 out of 12. It was not 12 out of 12. It was 11 out of 12. We had one left. After the 12 were seated, we still had a peremptory. And that's important. And we pointed this out, and the district court noted this in ruling in the state's favor. Had we been motivated by discriminatory intent, you would have expected, and this is how I believe the court phrased it, one would have expected the prosecution to use that 12th peremptory to take another female off the jury because the next juror in line was a male. We didn't do that. We had no discriminatory intent. The numbers don't establish discrimination on the part of the state. It's just the luck of the draw. And unless you'll have any questions, I'll go ahead and move on to the second claim. Regarding the sufficiency claim, it's our position that all the state courts below and the district, the eastern district court below, properly applied the law, the Jackson standard, as it relates to insanity. The burden in Louisiana, we start in Louisiana with the presumption of sanity. So we already have met our burden on that. Then the burden shifts to the defendant to prove by preponderance of the crime. And I think the district court below did a great job of articulating. They went back and cited in detail the findings of the Louisiana First Circuit Court of Appeal, which reviewed this during the appeal of right. And as the state courts looked at the issue and as the district court below looked at the issue, they were precluded from reweighing the evidence or trying to reevaluate the credibility of competing witnesses. The standard is only, is the evidence in the light most favorable to the state sufficient, in this case, to reject the defendant's claim of insanity? And we submit that it was. And the opinion below goes into great detail to point out how the state's experts evaluated these claims. Now, defense, I'm sorry, appellant counsel talked about the experts, the defense experts, considered a wide range of evidence. And she recited that evidence. She didn't mention the two letters the defendant wrote to her mother-in-law and her ex-husband at the time she committed these murders. And, you know, first of all, it's not a let's count the number of experts who testify, nor do we say we have to adopt one of these experts. The jury decides the facts of the case. The experts are there merely to help a juror understand facts and evidence, okay? And that's why we had mental health experts to understand what the issues were with regard to her mental state at that time. I believe it was Dr. Seiden, however, or it was Dr. Salcedo, should I add that, who said this case presented a very unique, and this makes it a factual situation, a very unique piece of evidence, which was the letters that she wrote. That's the only direct evidence of her mental intent, her mental state at the time of these killings. And the letters don't mention God or the devil. They don't mention voices. What they mention is, Chad, you wanted your own life, you got it, but I'll be if you get the kids. Very clear. No hint of psychosis. And if you want to, if you're tempted to weigh which expert got it right, I'd submit overwhelmingly the state's experts got it right. They looked at these letters. They testified there was no hint of psychosis in these letters. So I believe when the district court below reexamined what state courts had done and was their conclusion on the Jackson issue, was it consistent with the United States Constitution and prevailing Supreme Court opinions? It certainly was. So I would submit that on both issues the defendant, I'm sorry, the appellant, has failed to meet her burden, and we believe that relief in the state's favor, and this is what we're entitled to. And I really don't have any more unless you all have any questions for me. Thank you. Thank you. Thank you. Back to you, Ms. DeGioia, for rebuttal. I'd like to address a couple of the points that Mr. Soinier has made. First of all, he referred to the district court's statement that there was a strategic reason not to object, and, again, I'd point out that the strategic reason given by the district court judge referenced only one or two jurors, not all of them. There was not a strategic reason not to object to discrimination against jurors that the defense wanted. Also, the state refers to the fact that trial counsel was certified and highly experienced in capital cases, and I hasten to point out that one of these attorneys, the lead counsel in this case, has been decertified, in fact, for not handling cases properly, and also that his suggestion that the jury was exactly the way the defense wanted it and that they were brilliant in not making any more challenges. I would point out, as a capital lawyer for 17 years, that it is ineffective to not use all of your perimetries in a capital case because it means that you waive any objections to the death qualification of certain jurors. So if that's the standard for ineffective assistance or how trial counsel should have behaved, they failed on both measures. Also, we've never said that we've only got to rely on presumed prejudice, and the reason that we don't have to is because in the state post-conviction, the state proffered its gender-neutral reasons. Those gender-neutral reasons did not hold up, and for that reason, we can show that there was prejudice. There was actual prejudice because had they given those reasons, they would have been proven to be untrue by the record. On top of that, though, I would point out that the United States Supreme Court in Weaver v. Massachusetts only this past year said that ineffective assistance of counsel for failure to raise a structural error like a JEB v. Alabama objection for gender discrimination may just be one of those claims that we believe will be per se presumed prejudice. So while we aren't relying on that, I would say that the U.S. Supreme Court in only the last year has said that may just be one of those cases in Weaver v. Massachusetts. Also, as far as the numbers go, again, the fact that there were inevitably going to be a lot of females on the jury is only one consideration that this Court has to take into account. It's also not relevant to the fact that the strikes that were used by the prosecution against females was not happenstance. That was not inevitable. That was an intentional discrimination. I am not aware of any case where the state has used 12 peremptory strikes, whether it's 11 in regular and one in alternate or all 12. I am not aware of a case that was so in-your-face. And as a defense lawyer, that would hit you in the face. Also, with respect to—I'm sorry I didn't get you right that I did not get to the two letters, which I would have been happy to address in all of the evidence that the experts— this is with respect to the second issue, excuse me, on insanity. The letters were considered by the defense's experts, along with so many other pieces of evidence. The letters were the only thing that the state's experts considered, and that's why they did not overcome the defense's preponderance of the evidence standard, the evidence preponderated in favor of insanity. Also, there was also other contemporaneous evidence at the crime scene and then also at the hospital after Ms. Hebert was taken from the home, taken from her home, where the treating psychiatrist at the hospital witnessed her in the room having an auditory and visual hallucination of a demon in the room with her. She had to be medicated with three—she had to be restrained and medicated with three antipsychotics. Those sorts of pieces of evidence, that contemporaneous evidence, is evidence that this court in Perez v. Cain found very persuasive. And finally, with respect to the letters, the letters are actually consistent. As the experts for the defense found, the letters were actually consistent with her delusion that he was going to take away her kids. The state itself in opening statement said there was never any evidence he was going to take those kids. Never.  No evidence that the kids were going to be taken. That was part of her delusion. She heard the voice of what she thought was God saying, you need to kill your kids by stabbing them in their brains because your ex-husband is going to come and get them. Do it now. Do it quick. Four o'clock in the morning, she stabs her children in the skull 30 times. That's not sane behavior. And while those letters are easily the only piece of evidence that the state has to rest its case on, that's not all that happened here. That's not all that existed. There was so much more evidence. Excuse me, I'm out of time. I apologize. Counsel, we appreciate the quality of representation on both sides. Obviously a difficult case. We will review everything and we'll decide. This concludes the talk.